UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

05 CV  4950

ECF CASE

| | |
|---|---|
| K. J. EGLESTON, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS |
| JERRY L. MOSINGO, DAVID A. STOCKMAN, J. MICHAEL STEPP and BRYCE KOTH, | |
| Defendants. | JURY TRIAL DEMANDED |

RECEIVED
MAY 23 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon the investigation by plaintiff's counsel, for plaintiff's complaint (the "Complaint"), except for those allegations pertaining to plaintiff, which are based upon personal knowledge, alleges upon the investigation made by and through plaintiff's counsel, which included, among other things, a review of relevant public filings by Collins & Aikman Corporation ("Collins & Aikman" or the "Company") with the Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports and publicly-available trading data about the Company as well as a review of reports issued by analysts who followed Collins & Aikman. Plaintiff believes that substantial evidentiary support will exist for the allegations set froth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the publicly-traded securities of Collins & Aikman between May 15, 2003 and March 17, 2005, inclusive (the

"Class Period"), against certain officers and directors of Collins & Aikman for violations of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act").

2.    Collins & Aikman is engaged primarily in the design, engineering and manufacture of automotive interior components, systems and modules. The Company supplies products from three primary categories: plastic components and cockpits, soft trim and convertible roof systems.  Its products include instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and trim set, backlights, well slings, tonneau covers and power actuating systems.  Collins and Aikman employs 24,000 individuals and has a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries.

3.    On March 17, 2005, Collins & Aikman announced that it was delaying its 2004 earnings report due to improper accounting practices related to supplier rebates, which management believed would require a restatement of the results of the first three quarters of 2004.  The Company further announced that its internal investigation was ongoing and that the accounting improprieties could result in the Company restating its financial results for fiscal year 2003 as well.  In particular, the Company disclosed that it conducted an internal review of vendor rebates since 2002 and discovered that it had overstated revenues by approximately $12 million. The market reacted swiftly and negatively to the news: Collins & Aikman's common stock fell nearly 24% from a closing price of $1.63 on March 16, 2005 to close at $1.24 on March 17, 2005, on heavy trading volume, six times the average daily volume.

4.    The reported financial results of the Company were materially false and misleading, and in violation of Generally Accepted Accounting Principles ("GAAP"), as well as the Company's own stated accounting policies.  Moreover, Defendants represented to the public that Collins & Aikman was a successful automotive supply company, with good financial results,

while concealing that the Company's financial expectations were the results of Defendants' having artificially inflated the Company's revenues by failing to properly account for supplier credits and rebates.

5.      Investors that purchased stock in Collins & Aikman during the Class Period purchased stock at prices inflated by the misstatements alleged in this Complaint and were injured when the value of their investments fell and/or were squeezed out of the price of their securities.  The inflation in the price of the Company's stock caused by the misstatements described herein remained until the March 17, 2005 announcement that the Company's 2004 Form 10-K would be delayed due to the accounting irregularities admitted by the Company.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

9.      In connection with acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

10.      Plaintiff K. J. Egleston purchased Collins & Aikman stock at artificially inflated prices during the Class Period and has suffered damages as shown in the attached Certification.

11.    Non-party Collins & Aikman is incorporated under the laws of the State of Delaware, with its principal executive offices located at 250 Stephenson Highway, Troy, Michigan 48083. On May 17, 2005, Collins & Aikman announced that it and substantially all of its domestic subsidiaries had filed voluntary petitions to reorganize under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Michigan. But for the protection afforded to Collins & Aikman by the automatic stay provisions of the United States Bankruptcy Code, Collins & Aikman would be a defendant in this action.

12.    Defendant Jerry L. Mosingo ("Mosingo") served as Collins & Aikman's President and Chief Executive Officer until August 11, 2003. Defendant Mosingo approved Collins & Aikman's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending March 31, 2003, which was filed with the SEC during the Class Period.

13.    Defendant David A. Stockman ("Stockman") served as Collins & Aikman's Chief Executive Officer from August 11, 2003 until he resigned on May 12, 2005. During the Class Period, Stockman was Chairman of the Company's Board of Directors. Defendant Stockman approved Collins & Aikman's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2003 and September 30, 2004, respectively, which were filed with the SEC during the Class Period.

14.    Defendant J. Michael Stepp ("Stepp") served as Collins & Aikman's Vice President and Chief Financial Officer ("CFO") until October 13, 2004, when he stepped down as CFO. During the Class Period, Stepp was Vice Chairman of the Company's Board of Directors. Defendant Stepp approved Collins & Aikman's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K,

and the Company's quarterly reports on Form 10-Q for the periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, respectively, which were filed with the SEC during the Class Period.

15.     Defendant Bryce Koth ("Koth") has served as Collins & Aikman's CFO since October 13, 2004.   Defendant Koth approved Collins & Aikman's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending September 30, 2004, which was filed with the SEC during the Class Period.

16.     Defendants Mosingo, Stockman, Stepp and Koth are collectively referred to herein as the "Defendants."

17.     By reason of their positions with the Company, the Defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings.   As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

18.     Collins & Aikman and the Defendants, as officers and/or directors of a publicly-traded Company, had a duty to disseminate truthful and accurate information with respect to, and to correct any public statements issued by or on behalf of, the Company that had become false and misleading.

19.     Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to because artificially inflated.   Each of the Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

20.    Defendants are liable, jointly and severally, as direct participants in the co-conspirators of the wrongs complained of herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of Collins & Aikman during the Class Period and who suffered damages (the "Class"). Throughout the Class Period, Collins & Aikman's common stock actively traded on the NYSE under the ticker symbol "CKC." Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's report filed on Form 10-Q with the SEC on November 17, 2004, Collins & Aikman had approximately 83,630,087 shares of common stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Collins & Aikman or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of Collins & Aikman;

(c)    whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)    whether the market prices of the Company's common stock were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(e)    whether the members of the Class have sustained damages and the proper measure of such damages.

26.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.    On March 17, 2005, Collins & Aikman issued a press release announcing a delay in filing its Form 10-K and admitted that the Company had improperly accounted for $2 million in vendor rebates in 2004, thereby requiring a restatement of its results for the first three quarters of 2004 and perhaps of fiscal year 2003. Collins & Aikman further announced that the Company's audit committee had retained the law firm of Davis & Polk to assist with it ongoing investigation.

## MISREPRESENTATIONS DURING THE CLASS PERIOD

28.    The Class Period begins on May 15, 2003. On that date the Company issued a press release regarding its financial results for the first quarter of 2003. The press release stated in pertinent part:

> According to Jerry Mosingo, C&A President and CEO, "First quarter 2003 sales of $1.035 billion represented an increase of $120 million or 13 percent over 2002 first quarter sales of $915 million." This increase was attributable to new program launches, increased content per vehicle, favorable foreign exchange translation and sales from 2003 acquisitions.
>
> The company reported first quarter 2003 operating income of $17.4 million, a net loss from continuing operations of $28.7 million or 34 cents per share and EBITDA of $50.8 million. These results compared to operating income in the first quarter of 2002 of $54.4 million, a net loss from continuing operations of $6.7 million or 10 cents per share, and EBITDA of $84.9 million. The first quarter 2003 results include $18.1 million in charges for the impairment of long-lived assets and the first quarter 2002 results include $9.1 million of restructuring charges.
>
> EBITDA was $50.8 million for the first quarter of 2003. On a comparable basis, EBITDA for the first quarter of 2002 was $84.9 million, The first quarter 2003 EBITDA calculations include $18.1 million in charges for the impairment of long-lived assets and the first quarter 2002 EBITDA calculations included $9.1 million of restructuring charges. A reconciliation of our EBITDA, a non-GAAP financial measure, to U.S. GAAP operating income, our most comparable GAAP figure, is set out in the attached EBITDA reconciliation schedule. The company believes that EBITDA is a

8

> meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance, liquidity and entity valuation. EBITDA should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA differently.

29.     Collins & Aikman's financial results for the first quarter of 2003 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by Defendants Mosingo and Stepp. That Form 10-Q also stated:

> The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operation. Certain prior year items have been reclassified to conform to the 2003 presentation.

30.     On August 11, 2003, the Company announced the appointment of Defendant Stockman as Chief Executive Officer. Defendant Mosingo resigned as President, Chief Executive Officer and a Director of the Company.

31.     On August 15, 2003, the Company issued a press release entitled "Collins & Aikman Announces Second Quarter EPS of 13 Cents Reduces Net Debt by $54 Million," announcing its financial results for the second quarter of 2003. The press release stated in pertinent part:

> Collins and Aikman Corporation today reported second quarter and year-to-date results for the six months ended June 30, 2003. For the second quarter 2003, the company reported earnings per share of 13 cents from continuing operations versus a loss of 46 cents for the same period of 2002. The company reported second quarter 2003 sales of $1.034 billion and operating income of $43.5 million, which includes restructuring and asset impairment charges of $5.7 million. On a comparable basis for the second quarter 2002, Collins and Aikman reported sales of $1.085 billion and operating income of $81.5 million.
>
> We estimate net sales for the year will be $3.9 billion to $4.0 billion and we expect operating income to be in the $135 million to

$145 million range for 2003. EBITDA is expected to be in the $265 million to $280 million range. In light of our second quarter earnings we now anticipate the full year 2003 will result in a loss per common share of $.04 to $.05 range. These estimates are after all impairment and restructuring charges. Capital spending is expected to be in the $135 million to $145 million range for 2003.

32.    Collins & Aikman's second quarter 2003 financial results were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about August 15, 2003, which was signed by Defendants Stockman and Stepp. That Form 10-Q also stated:

The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operation. Certain prior year items have been reclassified to conform to the 2003 presentation.

33.    On November 13, 2003, the Company issued a press release entitled "Collins & Aikman Announces Improved Third Quarter Financial Results," regarding its financial results for the third quarter of 2003. The press release stated in pertinent part:

Collins and Aikman Corporation today reported third quarter and year-to-date results for the nine months ended September 30, 2003. For the third quarter, which is the company's seasonally weakest quarter, the company reported net sales of $902 million compared to $923 million in the third quarter of 2002, a 2% decline which mainly reflected reduced North American customer build volumes. The company also reported a loss of 38 cents per share from continuing operations versus a loss of 54 cents per share in the same period in 2002. The third quarter results included after-tax charges for restructuring and long-lived asset impairments of $16.0 million (or 19 cents per share) and $21.4 million (or 26 cents per share) in 2003 and 2002, respectively.

EBITDA was $41.9 million for the third quarter of 2003 as compared to $21.8 million for the third quarter of 2002. The third quarter 2003 EBITDA was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets. Results for the third quarter of 2002 included pre-tax charges of $25.1 million for restructuring and $8.7 million for the impairment of long-lived assets.

2003 Outlook

Effectively, there is no change to prior guidance for earnings excluding restructuring and impairment charges. All estimates below are after the impact of full-year pre-tax restructuring and impairment charges of $62 million, increased from our prior estimate of $42 million. We estimate net sales for the full year will be $3.9 billion to $4.0 billion and we expect operating income to be in the $115 million to $125 million range for 2003. EBITDA is expected to be in the $245 million to $260 million range. We not anticipate that full year 2003 will result in a loss per common share of 60 cents to 70 cents range. Capital spending is expected to be in the $155 million to $165 million range for 2003.

34.    Collins & Aikman's financial results for the third quarter of 2003 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about November 14, 2003, which was signed by Defendant Stepp. That Form 10-Q also stated:

The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operation. Certain prior year items have been reclassified to conform to the 2003 presentation.

35.    On February 17, 2004, the Company reported that it closed on a syndication of a material financing facility:

Collins and Aikman Corporation announced today that the company on Friday, February 13, 2004 closed on its syndication of a $100 million Supplemental Revolving Credit Facility and a $185 million Tranche A-1 Term Loan. The Supplemental Revolving Credit Facility will be available for revolving credit loans and letters of credit. The proceeds of the Tranche A-1 Term Loan will be used to further improve liquidity by voluntarily prepaying the existing two term loans in forward order of maturity and will also reduce the applicable interest rate margins. Other terms and conditions are substantially the same as the existing facilities and term loans. These financings mature on December 31, 2005. J.P. Morgan Securities, Inc. and Deutsche Bank Securities, Inc. served as Joint Bookrunners and Lead Arrangers for these transactions.

36.    On March 11, 2004, Collins & Aikman filed a press release entitled "Collins & Aikman Announces Record Sales and Fourth Quarter Financial Results," announcing record financial results for the fourth quarter and year-end Fiscal Year 2003.  Specifically, the Company reported net sales of $1.013 billion in the fourth quarter of Fiscal Year 2003, as compared to $963 million in the fourth quarter of 2002, a 5% increase.  The Company further reported a loss of $0.14/share from operations in the fourth quarter of 2003, which included after-tax charges for restructuring and long-lived asset impairments of $16.7 million (or 20 cents per share), compared to a loss of $0.04 cents per share in the comparable period in 2002, which included after-tax charges for restructuring and long-lived asset impairments of $13.0 million (or 16 cents per share).  The press release elaborated on the Company's financial results as follows:

> The fourth quarter 2003 pre-tax restructuring charge of $13.8 million included costs associated with the previously announced third quarter restructuring actions that would reduce the Company's salaried workforce by almost 800 or 15%.  This restructuring initiative and related actions are expected to reduce the company's fixed-cost structure by $80 million per year.

> For the full-year 2003, the company reported sales of $3.98 billion compared to $3.89 billion in the same period of 2002.  The company also reported a net loss available to common shareholders from continuing operations of $59.1 million or 71 cents per share, which included $49.9 million (or 60 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2002 period, the net loss available to common shareholders from continuing operations was $86.7 million of $1.15 per share, which included after tax charges for restructuring and long-lived asset impairments of $40.9 million (or 53 cents per share).

> C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.346 billion at December 31, 2003.

> *        *        *

> EBITDA was $69.4 million for the fourth quarter of 2003, which was reduce d by charges of $13.8 million for restructuring and $7.3 million for the impairment of long-lived assets.  The fourth quarter

2003 EBITDA was $68.2 million, which was reduced by charges of $4.8 million for restructuring and $9.3 million for the impairment of long-lived assets.

37.     On March 17, 2004, Collins & Aikman filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2003, which was signed by Defendants Stockman and Stepp.  The 2003 10-K repeated and reaffirmed the same materially false and misleading financial information that was contained in the March 11, 2004 press release, and further stated that:

> The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reporting period.  Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results.  Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.  Certain of the Company's more critical accounting estimates are described below.

> \*     \*     \*

> As of the end of the period covered by this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer, the Certifying Officers," evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management, including its Certifying Officers, as appropriate to allow timely decisions regard required disclosure.  In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data.  A summary of the key items disclosed and

the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls: Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

38.    On May 6, 2004, Collins & Aikman issued a press release entitled "Collins & Aikman Announces First Quarter Financial Results And Record First Quarter Sales," announcing its financial results for the first quarter of 2004, the period ending March 31, 2004. More specifically, the Company reported:

The company reported record first quarter net sales in 2004 of $1.066 billion compared to $1.035 billion in the first quarter of 2003, a 3% increase which mainly reflects improved currency impact. The company reported a loss of $23.3 million or 28 cents per share in the first quarter of 2004, which included after-tax charges for restructuring, long-lived asset impairments and costs related to early extinguishment of debt of $10.6 million (or 13 cents per share).

In the comparable 2003 quarter, the company had a loss of $26.2 million or 31 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $13.2 million (or 15 cents per share).

Commenting on the company's first quarter operating results, David A. Stockman, C&A Chairman and CEO stated, "We are pleased with the significant performance improvement in EBITDA before restructuring and impairment charges. For the third consecutive quarter our EBITDA results were up double digits from the prior year on a comparable basis. We are also seeing our previous problem plants turning around their financial results from the 2003 levels."

The first quarter 2004 pre-tax restructuring charge of $9.5 million included costs associated with additional rightsizing efforts to reduce corporate overhead and salaried headcount and to close additional manufacturing facilities. This restructuring initiative is

14

> expected to further reduce the company's fixed-cost structure by approximately $13 million when fully implemented. C&A's net debt, including out standings under an off-balance sheet accounts receivable facility, was $1.432 billion at March 31,2004.

39.    Collins & Aikman's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 7, 2004, which was signed by Defendant Stepp. That Form 10-Q also stated:

> The condensed consolidated financial statement include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

40.    On August 2, 2004, Collins & Aikman issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004. More specifically, the Company, in its press release, stated:

> The company reported record second quarter 2004 net sales of $1.036 billion. The company reported a loss of 35 cents per share in the second quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments of $26.0 million (or 3 1 cents per share). In the comparable 2003 quarter, the company had income of 13 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $4.4 million (or 5 cents per share).

> Commenting on the company's second quarter operating results, David A. Stockman, C&A Chairman and CEO, stated, "For the fourth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis. The savings from the restructuring program that began in the third quarter of 2003 is resulting in significant fixed cost savings as indicated by our year-over-year decline in selling, general and administrative expenses."

> The second quarter 2004 pre-tax restructuring charge of $10.4 million included costs associated with additional actions to right size its overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's

cost structure by approximately $11 million when fully implemented. During the second quarter 2004, the company recognized $27.4 million of impairments of long-lived assets primarily related to $13.6 million of Intellimold assets and $11.0 million of customer contracts as a result of changes in customer sourcing.

For the six months ended June 30, 2004, the company reported sales of $2.103 billion compared to $2.069 billion for the comparable period of 2003. The company also reported a net loss of $53.0 million or 63 cents per share, which included $35.6 million (or 43 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2003 period, the net loss was $15.5 million or 19 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $17.2 million (or 21 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.439 billion at June 30, 2004.

41.    Collins & Aikman's financial results for the second quarter of 2004 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about August 3, 2004, which was signed by Defendant Stepp. That Form 10-Q further stated that:

The condensed consolidated financial statement include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

42.    On August 26, 2004, the Company issued a press release announcing the completion of its offering of $415 aggregate principal amount of Senior Subordinated Notes:

Troy, Michigan – Collins & Aikman Corporation [NYSE: CKC], today announced that its wholly owned subsidiary, Collins & Aikman Products Co. ("Products"), completed an offering of $415 million in aggregate principal amount of its senior subordinated notes due 2012 for gross proceeds of approximately $400 million. The notes bear interest at a rate of 12⅞%. The notes are guaranteed by Collins & Aikman Corporation and each of Products' domestic subsidiaries that is a guarantor under its senior credit facility. As previously announced, the gross proceeds from the notes offering will be used to redeem all $400 million in principal amount of Products' 11½% senior subordinated notes due 2006.

43.    On November 9, 2004, Collins & Aikman announced the Company's financial results for the third quarter of 2004, the period ending September 30, 2004. Specifically, the Company reported third quarter 2004 net sales of $864.8 million, resulting in a loss of 67 cents per share in the third quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt of $25.1 million (or 30 cents per share). The Company further stated that:

> The third quarter 2004 pre-tax restructuring of $9.0 million included costs associated with additional actions to right-size the company's overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $20 million when fully implemented. During the third quarter of 2004, the company also recognized $10.3 million of impairments of long-lived assets primarily related to plant closings.

> For the nine months ended September 30, 2004, the company reported sales of $2,968 million compared to $2,971 million for the comparable period of 2003. The company also reported a net loss of $108.6 million or $1.30 per share, which included $61.7 million (or 74 cents per share) of after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt. For the comparable 2003 period, the net loss was $47.6 million or 57 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $33.1 million (or 40 cents per share).

> Collins & Aikman's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1,552 million at September 30, 2004. During the third quarter of 2004, the company completed the refinancing of its senior subordinated debt and senior credit facilities.

> EBITDA was $48.7 million for the third quarter of 2004, which was reduced by charges of $9.0 million for restructuring and $10.3 million for the impairment of long-lived assets. The third quarter 2003 EBITDA was $41.9 million, which was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets. EBITDA was $178.2 million for the nine months ended September 30, 2004, which was reduced by charges of $28.9 million for restructuring and $40.7 million for impairment of long-lived assets. EBITDA for the nine months ended

September 30, 2003 was $172.8 million, which was reduced by charges of $26.8 million for restructuring and $21.1 for the impairment of long-lived assets.

44.    Defendants Stockman touted the Company's results, stating: "For the fifth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges, was up from the prior year on a comparable basis. This was achieved despite the headwinds from increased commodity costs and OEM production cuts. The savings from the restructuring program that began in the third quarter of 2003 has generated significant fixed cost reductions."

45.    Collins & Aikman's financial results for the third quarter of 2004, the period ending September 30, 2004, were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about November 17, 2004, which was signed by Defendants Stockman and Koth. That Form 10-Q further stated that:

> The consolidated financial statement include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

46.    On December 13, 2004, the Company issued a press release announcing that Collins & Aikman Products Co. ("Products"), a wholly owned subsidiary of Collins & Aikman, and CARCORP, Inc., a wholly owned subsidiary of Products, amended their existing receivables transfer agreement related to its off-balance sheet accounts receivable financing facility. The amended terms included extending the term of the facility to March 10, 2006, and installing General Electric Capital Corporation ("GECC") as the new Administrative Agent. Additionally, Products and CARCORP entered into a commitment letter agreement with GECC whereby GECC committed to provide a new 5 year, $300 million accounts receivable facility to replace the existing receivables facility, subject to the terms and conditions described therein.

47.     The statements referenced in ¶¶ 28-29, 31-34, 36-41, and 43-45 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others: (1) that the Company improperly accounted for certain supplier rebates; (2) that the Company's financial statements required net adjustments of approximately $10-$12 million; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company; and (5) that as a consequence of the foregoing, the Company's net income and financial results were materially overstated.

## THE TRUTH EMERGES

48.     On March 17, 2005, Collins & Aikman issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters," in which the Company disclosed that it would be delaying its financial results for Fiscal Year 2004. The Company stated it had initiated an internal review of how it was accounting for supplier rebates, which revealed that the Company was prematurely or inappropriately recognizing revenue. The Company stated that it expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates and that it was continuing to evaluate whether a restatement of its fiscal year 2003 results would be necessary. The Company stated that it expected to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004. The press release stated:

> The Company did not file its Annual Report on Form 10-K containing fiscal 2004 audited financial statements by its due date yesterday since it requires additional time to complete the review of the accounting issues referred to below, the financial reporting process, and the Company's assessment of controls over financial reporting. As permitted by Rule 12b-25 under the Securities

Exchange Act of 1934, the Company today filed a notification providing that, among other things, its Form 10-K filing will nonetheless be timely filed if it is filed no later than 15 calendar days after its original due date. The audit, and other necessary work required for the Form 10-K to be filed, may not be completed within that extended time frame.

During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated an internal review of these matters and expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. The Company presently expects to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004. The Company's outside auditors have not reviewed these conclusions, and additional adjustments may be required.

*     *     *     *

**Internal Accounting Investigation and Related Matters**

In the ordinary course, the Company has received and continues to receive rebates as a result of anus length transactions with its vendors. Depending upon the terms of the rebate agreement, these rebates are either recognizable in the quarter in which the rebate agreement is reached or recognized over an appropriate future period. In the course of finalizing the Company's 2004 financial results, the Company identified certain issues related to accounting for supplier rebates that led to premature or inappropriate income recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it has properly recognized the rebates in the appropriate quarterly period. The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures and other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices. The nature and scope of that review is under consideration. The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the Company believes that net adjustments of approximately $10 - $12 million, are required primarily occurring during fiscal 2004. The Company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken into account this impact in our preliminary report of 2004 results. These preliminary results remain subject to material change and have not been reviewed by our outside auditors.

The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004, but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review. The Company's outside auditor is in the process of completing its audit of internal controls over financial reporting and has communicated the existence of material weaknesses. The potential material weaknesses identified include

the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation- related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is ongoing.

While the Company has implemented remediation steps with respect to certain significant deficiencies and material weaknesses, a number of issues still need to be addressed. The Company's remediation plans include the assignment of specific resources with given timelines for each finding. Measurement criteria have also been established to monitor the progress of these remediation efforts. To ensure that the Company addresses these issues thoroughly, effectively, and timely, the internal audit department has been supplemented with the services of several outside specialists. Further required remediation will be identified and undertaken as a result of the internal accounting investigation.

**Impact on Financing Arrangements**

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and

22

other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

49.    Upon this disclosure, shares of the Company's stock fell $0.39 per share, or about 24% to close at $1.24 per share, on unusually heavy trading volume.

## POST CLASS STATEMENTS

50.    On March 24, 2005, Collins & Aikman issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters." Therein the Company, stated:

Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee has retained independent counsel to assist it in its investigation of the Company's accounting for certain supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The company's management immediately initiated an internal review of these matters while keeping the company's Audit Committee and outside auditors, KPMG LLP, informed of the status of its review. The Audit Committee has determined to conduct an independent investigation into these matters. It has retained independent counsel, Davis Polk & Wardwell, for that purpose, and they expect to retain such other advisors, including an accounting expert, as they deem appropriate.

As previously announced, the company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the company's management believes that net adjustments

of approximately $10-$12 million are required primarily occurring during fiscal 2004. For further clarification, the company announced that management's preliminary analysis indicates that, of such amounts, approximately $8-$10 million would impact the previously reported nine months ended September 30, 2004 with the balance impacting 2003. The company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions and is continuing to evaluate whether a restatement of its 2003 results will be necessary. The company's Audit Committee and the Company's outside auditors, KPMG LLP, have no commented upon management's current expectations. The company cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the Audit Committee investigation, the audit or any necessary restatements. Nor can it comment upon whether the outcome of the investigation will impact the foregoing adjustments.

As previously disclosed, the company has not yet filed its annual report on Form 10-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of internal controls over financial reporting under Section 404 under Sarbanes-Oxley. The company further announced that it initiated a process for obtaining waivers of the financial statement delivery requirements for a period of time from its lenders under its senior credit facility and for modifications of certain of its financial covenants. There can be no assurance that any of the required or desirable waivers from our senior lenders, lessors or others will be received on a timely basis, and the failure to obtain waivers could materially and adversely affect the company and its liquidity.

## COLLINS & AIKMAN'S VIOLATION OF GAAP IN ITS FINANCIAL STATEMENTS AND PRESS RELEASES

51.     Defendants were required to cause the Company to disclose, in its financial statements and news releases, the existence of the material facts described herein and to appropriately recognize and report revenues in conformity with GAAP. Defendants failed to cause the Company to make such disclosures and to account for and to report revenues in conformity with GAAP.

52.     Due to the misrepresentations, omissions, and non-GAAP accounting, the above particularized documents which Defendants caused the Company to disseminate to the investing public during the Class Period were materially false and misleading.

24

53.    Defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above particularized press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set above.

54.    SEC Regulation SX requires that financial statements filed with the SEC conform with GAAP. Financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading or inaccurate. [17 C.F.R. §210.401 (a)(1)]. The Company's financial statements which were disseminated to the investing public during the Class Period, which represented that the Company's financial position and results of operations were in conformity with GAAP, were false and misleading for the reasons alleged herein and because they will not be prepared in conformity with GAAP. Said financial statements violated the following GAAP concepts and principles, among others noted above:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

b.    The concept that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Financial Accounting Concepts No. 1).

c.    The concept that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Financial Accounting Concepts No. 2).

d.    The concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2).

e.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Financial Accounting Concepts No. 2).

f.    The principle that the accounting method applied should be appropriate in the circumstance (AU 411.04).

g.    The principle that the financial statements, including the related notes, should be informative of matters that affect their use, understanding, and interpretation (AU 411.04).

h.    The principle that the financial statements should reflect the underlying events and transactions in a manner that present the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain accuracy in financial statements (AU 411.04).

i.    The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements (APB Opinion No. 22).

55.    The SEC has stated, in Securities Act Release No. 6349 (September 8, 1981), that "...it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

56.    In addition, as noted by the SEC in Accounting Series Release 173: "...it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

57.    The Company, in contravention of GAAP, failed to (i) provide those disclosures which were required by GAAP, and (ii) identify and address those key variables and other qualitative and quantitative factors which were peculiar to and necessary for an understanding and evaluation of the Company. Consequently, the overall impression created by the financial statements was not consistent with the business realities of the Company's reported financial position and operations.

58.    The undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, rules of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed to the investing public. This information is known by corporate officials and their legal

26

and financial advisors to be the type of information which is expected to be and must be disclosed. For example, under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results."

## UNDISCLOSED ADVERSE INFORMATION

59.    The market for Collins & Aikman common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Collins & Aikman's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Collins & Aikman common stock relying upon the integrity of the market price of Collins & Aikman's common stock and market information relating to Collins & Aikman, and have been damaged thereby.

60.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Collins & Aikman's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

61.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading

statements about Collins & Aikman's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Collins & Aikman and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

62.     Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

63.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Collins & Aikman, their control over, and/or receipt and/or modification of Collins & Aikman's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Collins & Aikman, participated in the fraudulent scheme alleged herein.

64.     Defendants were further motivated to engage in this course of conduct in order to (i) complete an offering of $415 million in aggregate principal amount of its senior subordinated notes; and (ii) enter into a new credit facility on more favorable terms.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

65.    At all relevant times, the market for Collins & Aikman stock was an efficient market for the following reasons, among others:

(a)    Collins & Aikman's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Collins & Aikman filed periodic public reports with the SEC and the NYSE;

(c)    Collins & Aikman regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Collins & Aikman was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for Collins & Aikman's common stock promptly digested current information regarding Collins & Aikman from all publicly available sources and reflected such information in Collins & Aikman's stock price. Under these circumstances, all purchasers of Collins & Aikman's common stock during the Class Period suffered similar injury through their purchase of Collins & Aikman's stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

67.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Collins & Aikman who knew that those statements were false when made.

## LOSS CAUSATION

68.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Collins & Aikman's stock price and operated as a fraud or deceit on Class Period purchasers of Collins & Aikman stock by misrepresenting the Company's business success and future business prospects. Defendants achieved this facade of success, growth and strong future business prospects by blatantly misrepresenting the Company's results and business prospects. Later, however, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Collins & Aikman stock fell precipitously as the prior artificial inflation was removed from Collins & Aikman's stock price. Defendants' false and misleading statements had the intended effect and caused Collins & Aikman stock to trade at artificially inflated levels throughout the Class Period. As a result of their purchases of Collins & Aikman stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLAIMS ALLEGED

### FIRST CLAIM

**Violation Of Section 10(b) Of The Exchange Act And Rule
10b-5 Promulgated Thereunder Against The Defendants**

69.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Collins & Aikman's business, operations, management and the intrinsic value of Collins & Aikman common stock; (ii) enable the Company to complete an offer of $415 million in aggregate principal amount of its senior subordinated notes; (iii) enable the Company to enter into a new credit facility on more favorable terms than it would have had the truth been known; and (iv) cause plaintiff and other members of the Class to purchase Collins & Aikman's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

71.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Collins & Aikman's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

72.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of

31

conduct to conceal adverse material information about the business, operations and future prospects of Collins & Aikman as specified herein.

73.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Collins & Aikman's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Collins & Aikman and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Collins & Aikman securities during the Class Period.

74.     The Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Defendants were high-level executives (Defendants Stockman and Stepp were also Chairman and Vice Chairman, respectively, of the Company) at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) Defendants, by virtue of their responsibilities and activities as a senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Defendants enjoyed significant personal contact and familiarity with the other controlling persons of the Company and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendants were aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

75.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Collins & Aikman's operating and reporting condition and future business prospects from the investing public and to create and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements, misstatements and omissions regarding the Company's business, its business prospects and the financial health of the Company, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Collins & Aikman's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of Collins & Aikman's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiff and the other members of the Class acquired Collins & Aikman securities during the Class Period at artificially high prices and were damaged thereby.

77.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth with regard to the distribution, adoption, and integration of its products, which were not disclosed by defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their Collins & Aikman common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

79.    As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The
### Exchange Act Against The Defendants

80.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.    The Defendants acted as controlling persons of Collins & Aikman within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to

copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.    As set forth above, Collins & Aikman and Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 23, 2005                                  Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:_____
Fred T. Isquith, Esq.
Gustavo Bruckner, Esq.
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

**GAINEY & McKENNA**
Thomas J. McKenna
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**Attorneys for Plaintiff**

403084v3

## CERTIFICATION OF NAMED PLAINTIFF

To:  Thomas J. McKenna, Esq.        Tel:  212-983-1300
     Gainey & McKenna                Fax:  212-983-0383
     485 Fifth Avenue, 3rd Floor     e-mail: tjmckenna@gaineyandmckenna.com
     New York, New York 10017

I, K. J. Egleston ("Plaintiff") hereby retain Gainey & McKenna, subject to their investigation, to pursue my claims on a contingent fee basis, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff reviewed the draft complaint to be filed in this matter and authorized the filing.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Collins & Aikman Corp.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 1000 | CKC | Buy | 08/05/04 | $5.00 |
| 1000 | CKC | Buy | 11/15/04 | $2.99 |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years: NONE

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May, 2005

_K. J. Egleston_____
Signature

K.J. Egleston_____
Print Name